## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MICHAEL G.,

      Plaintiff,

      v.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF SOCIAL
SECURITY,[1]

      Defendant.

No. 19 CV 06017

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Plaintiff Michael G. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, the Court denies Plaintiff's motion for summary judgment [12],[2] grants the Acting Commissioner of Social Security's (Commissioner) motion for summary judgment [26] and affirms the Commissioner's decision denying Plaintiff's application for benefits.

### Procedural Background

In March 2016, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of March 2, 2016. [10-6] 141-142.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [10], which refer to the page numbers in the bottom right corner of each page.

Plaintiff's claim was denied initially and on reconsideration. [10-4] 61-65; 68-74. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on April 17, 2018. [10-3] 14. In a decision dated October 30, 2018, the ALJ found that Plaintiff was not disabled. [*Id.*] 14-20. The Appeals Council denied review on July 11, 2019, [*id.*] 1-7, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely appealed to this Court [1], and the Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[3]

### Factual Background

Plaintiff, who was sixty-one years old at the time of his alleged onset date, [10-4] 61, had been working in a warehouse job for thirteen years until he was laid off in March 2016 due to the company downsizing. [10-3] 37. Around the same time in March 2016, Plaintiff was diagnosed with a renal mass and rectal cancer. [10-8] 285. Plaintiff subsequently sought disability benefits, alleging an onset date of March 2, 2016, due to his cancer diagnosis and renal mass. *See* [10-4] 61.

## I. Medical Record Evidence of Plaintiff's Impairments and Treatment

The medical record evidence establishes that in early 2016 Plaintiff reported that he was experiencing right groin pain and blood-tinged stools. [10-8] 285. A CT scan in February 2016 revealed a renal mass, and a subsequent colonoscopy showed cancer of the rectosigmoid colon. [*Id.*]. The same CT scan that revealed the renal mass also showed mild to moderate degenerative changes at two levels of his lumbar spine. [*Id.*] 283.

---

[3] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. [8].

On March 18, 2016, Plaintiff underwent surgery to remove the renal mass. [10-9] 326. He subsequently began his first round of chemotherapy for his rectal cancer, which lasted from April 7, 2016 to May 6, 2016. [10-14] 605. Plaintiff was separately admitted to the hospital and required inpatient treatment from May 6, 2016 to May 8, 2016 for worsening cellulitis. [10-9] 321. Then, in early June 2016, billing records indicate that Plaintiff began residing in an assisted living community. [10-6] 167-169.

In July 2016, Plaintiff underwent multiple surgical procedures to address his rectal cancer, including a partial transverse colectomy to remove part of his colon, and an ileostomy, a procedure to bring the small intestine to the surface of the skin so that waste can be collected in an external pouch (ostomy bag). *See* [10-16] 808-809; [27] 3. Plaintiff was discharged from the hospital on July 20, 2016, with a referral for home health care. [10-19] 925-926. A nursing assessment completed on July 22, 2016, indicates that Plaintiff was experiencing several health issues after his surgery, such as muscle weakness, abnormal gait and mobility issues, and frequent diarrhea; and also that he required supervision because he was forgetful and demonstrated impaired decision making. *See generally* [10-20] 987-1009. On August 8, 2016, Plaintiff's physician overseeing his home health care prescribed Plaintiff physical therapy to address back pain. [10-23] 1197-98. Nursing assessment notes from September 1, 2016, showed that Plaintiff continued to experience residual weakness and was unable to leave the home assisted, but that he did not have pain, or at least any pain he experienced did not interfere with his activities. [10-20] 1046-47. A further home health care certification and plan form from September 20, 2016

indicated that Plaintiff was suffering from bowel and bladder incontinence, had functional limitations related to his endurance and ambulation, and suffered from generalized muscle weakness, anxiety, and was forgetful. [10-21] 1076.

On September 30, 2016, Plaintiff was admitted to the hospital for an elective reversal of his ileostomy, and was treated as an inpatient through October 4, 2016. [10-18] 813. Records over the course of the few days after the surgery, including physical therapy notes, indicate that Plaintiff was doing very well, his pain was well controlled, and he was ambulating without difficulty. [10-21] 1058-1063. Plaintiff was discharged October 4, 2016, and was again referred for home health care services. [10-21] 1048. Plaintiff was certified for home health care through November 18, 2016, and then was recertified through January 17, 2017. [10-23] 1182, 1186.

Home health care notes show that Plaintiff received nursing visits once or twice each week after his discharge in October 2016 through the end of November 2016, primarily for the purpose of cleaning and dressing his wound from his surgery. *See generally,* [10-22] 1083-1155. Notes from these visits indicate that Plaintiff sometimes reported residual weakness and suffered from diarrhea, though not at every visit, and the notes also consistently indicate he was not in pain, or at least any pain he experienced did not interfere with his ability to perform activities. *See, e.g.,* [*id.*] 1122-1123, 1127, 1134. Notes from November 11, 2016 indicate that Plaintiff's surgery wound had healed and required no further dressing. [*Id.*] 1148.

The nursing notes from November 11, 2016 also indicate that Plaintiff had recently returned to his oncologist for a follow up appointment and had begun taking

4

an oral chemotherapy medication, with the goal to be on the drug for a regiment of two weeks on, one week off, for a total of 24 weeks. [*Id.*] 1148.[4] Notes from around this time in late November 2016 indicate that his nurses were helping Plaintiff manage the side effects of his chemotherapy medication, but that Plaintiff was feeling overwhelmed and was experiencing diarrhea 6-8 times a day. *See* [10-22] 1147-49; [10-23] 1175-76, 1181. Plaintiff's home health care recertification form from November 19, 2016, which certified him for care up to January 2017, indicated that Plaintiff had functional limitations in endurance and ambulation, that he should only be up as tolerated, and that he was unable to leave his home unassisted. [10-23] 1186.

After November 2016, the medical evidence becomes much more sporadic with significant gaps in the records. Although Plaintiff was certified for home health care until January 17, 2017, [*id.*], and billing statements indicate he continued to reside at his assisted living facility until July 2017, [10-6] 167-169, there are not treatment records or home health care nursing notes in the record reflecting any visits after the end of November 2016. The next medical progress note comes over six months later on June 21, 2017, when Plaintiff had a follow up appointment at the hospital that oversaw his cancer treatment. *See* [10-15] 717-18. The notes from the visit indicate that Plaintiff had a good appetite and energy level, and that he denied any pain. [*Id.*].

---

[4] Oddly, there do not appear to be other contemporaneous records reflecting Plaintiff's follow up appointment with his oncologist and the prescription for the chemotherapy drug. Rather, the only evidence in the record appears to be Plaintiff mentioning the visit and the new chemotherapy regiment to his nurses at his home health visits in November 2016. As discussed further *infra*, while Plaintiff also testified about the chemotherapy regiment, there are no other records after November 2016 indicating how long Plaintiff remained on the drug, or whether he received any other related care or treatment.

The notes further indicate that there was "nothing on review of systems to suggest symptomatic progression of disease." [*Id.*]. The result was the same at a further follow up appoint in October 2017, with the notes again indicating good appetite and energy level, no pain, and nothing indicating a progression of the cancer. [*Id.*] 727-28. The only other medical records are notes from colonoscopies in early 2018, which returned normal findings and no signs of disease. *See* [*id.*] 712-713.

## II. Testimonial Evidence

In addition to the medical record evidence discussed above, Plaintiff and his brother both testified at the hearing in support of his claim.

Plaintiff testified that he resided at an assisted living facility until July 2017 when he completed his second round of chemotherapy treatment. [10-3] 38-39, 45. Plaintiff stated that after his surgeries, he had to use the bathroom more frequently, "a dozen times a day," but denied that he was experiencing incontinence. [*Id.*] 42. Plaintiff also testified that he was not as strong as he was before the surgery, and got tired easily. [*Id.*] 40. Specifically, he testified that he could only walk for one block at a time before needing to rest, and he expressed difficulty carrying heavy items such as when he goes grocery shopping. [*Id.*] 40-41. On the other hand, he also testified that he was able to drive without issue, other than needing to stop occasionally to use the restroom, and was able to take care of cleaning himself. [*Id.*] 42-43. Finally, Plaintiff testified that he experienced pain in his back for "months," though he could not provide a specific timeline. [*Id.*] 43.

Plaintiff's brother testified that Plaintiff underwent a "substantial" physical

and mental change following his cancer diagnosis and treatment. [*Id.*] 48. Specifically, his brother testified that Plaintiff's walking changed, in that he had more of a "shuttle instead of a stride," and that he developed certain "twitches" or "ticks" he had not had since his childhood. [*Id.*]. Plaintiff's brother further testified that Plaintiff lived in the assisted living facility through July 2017, and that he helped pay to have Plaintiff live in the facility because, although he described Plaintiff as "self-sufficient," he thought Plaintiff needed help with certain everyday chores, could not take his ostomy bag on and off, and needed someone to check up on him. [*Id.*] 49, 52-53

In addition to his testimony, Plaintiff's brother submitted two letters in support of Plaintiff's claim. The first letter, from April 20, 2017, stated that Plaintiff required many urgent care visits throughout his stay at the assisted living facility between June 2016 and July 2017, "especially in dealing with his ostomy bag." [10-7] 256. In the second letter, dated November 21, 2017, Plaintiff's brother stated that he had suspected that Plaintiff had an autistic disorder, because throughout his life Plaintiff had difficulty maintaining relationships or friendships and with changes in routines or performing tasks that were not party of his daily pattern. [10-7] 247. The letter also stated that Plaintiff was physically strong until his recent cancer diagnosis, and that since his "medical issues" he had had a hard time sitting for extended periods of time. [*Id.*].

### III.    Medical Opinion Evidence

#### A. State Agency Consultants

The record contains opinions from two state agency consultants who reviewed Plaintiff's disability claim at the initial and reconsideration levels. In May 2016, Dr. Vidya Madala, M.D., reviewed the medical records available at that time and noted that Plaintiff was currently undergoing chemotherapy and, in Dr. Madala's opinion, appeared to be responding well to treatment with no side effects. [10-4] 64. Dr. Madala opined that Plaintiff's impairments should not last more than twelve months, and therefore the impairments were not severe. [*Id.*]. Then, in October 2016 at the reconsideration level, Dr. Julio Pardo, M.D., reviewed the record up to that point and offered the same opinion as Dr. Madala: that Plaintiff was responding well to his treatment with no side effects, and that his impairment should not last more than twelve months and were therefore not severe. [*Id.*] 72.

#### B. Consultative Examination by Dr. Mark Amdur

Plaintiff's medical record also includes a June 29, 2017 forensic psychiatric evaluation report by Dr. Mark Amdur, M.D. [10-15] 703-711. The psychiatric evaluation was completed at the request of Plaintiff's attorney, and it was the only time Plaintiff was seen by Dr. Amdur. *See* [*id.*] 703; [10-3] 19. Dr. Amdur stated in his report that no medical evidence was available, and that he interviewed Plaintiff and his brother at Plaintiff's attorney's law offices. [10-15] 703.

Plaintiff reported to Dr. Amdur that he did not have the strength he used to have, lacked energy, and went to the bathroom a lot. Plaintiff also reported that he

tired easily. [*Id.*] 703. When asked about mental or emotional problems, Plaintiff reported that he had a problem with depression and had been taking antidepressant medications, and was particularly depressed in relation to when he had to use his ostomy bag, which was eventually reversed in the fall of 2016. [*Id.*] 703-704. Plaintiff further stated that his temper control had been "a little bit of a problem now and then," and that while he had never attempted suicide, he had serious suicidal thoughts during the time he was getting chemotherapy and had the ostomy bag. [*Id.*] 704. However, Plaintiff reported that he had no other physical or somatic concerns, other than worrying about the recurrence of his cancer. [*Id.*]. Plaintiff also denied any classic obsessive-compulsive symptoms. [*Id.*].

After interviewing Plaintiff, Dr. Amdur also interviewed Plaintiff's brother, who was present at the examination. Plaintiff's brother reported to Dr. Amur that, prior to Plaintiff's cancer diagnosis, Plaintiff was "essentially homeless," and was living in very "deteriorated circumstances" after having been financially exploited. [*Id.*] 706. Plaintiff's brother reported that Plaintiff had a lifelong problem of being easily taken advantage of by others. [*Id.*]. Plaintiff's brother also stated that Plaintiff was "OCD" and "very quirky," and reported to Dr. Amdur that Plaintiff had odd habits like taking extremely long showers and not drying himself off, and odd verbal communication habits like being repetitive and insisting on verbatim recitations of conversations that he had heard. [*Id.*]. Plaintiff's brother also told Dr. Amdur that Plaintiff was "shy and doesn't look at people," had trouble budgeting, and tended to "follow routines and not deviate from routines." [*Id.*]. The report indicates that at the

9

end of the interview, Plaintiff's brother paused and then asked Dr. Amdur if he thought that Plaintiff was autistic. [*Id.*].

In addition to interviewing Plaintiff and his brother, Dr. Amdur conducted a mental status examination. [*Id.*]. Dr. Amdur found that Plaintiff walked with a normal gait and he observed no bizarre or inappropriate behavior. [*Id.*]. Dr. Amdur observed that Plaintiff's hygiene and grooming were satisfactory, he sat calmy through the interview, and was cooperative, focused, and generally understood the questions posed to him. [*Id.*]. Dr. Amdur also administered a cognitive assessment, and indicated that "any cognitive impairment is slight." [*Id.*] 706. Dr. Amdur went on to state that "[t]here is pervasive denial and minimization," and that an "accurate appreciation of [Plaintiff's] condition is not possible without the brother's collateral information." [*Id.*].

At the conclusion of the report, Dr. Amdur diagnosed Plaintiff with "Autism Spectrum Disorder with Obsessive-Compulsive Features." [*Id.*] 707. Dr. Amdur opined that "[a]nosognosia, denial, or minimization colors [Plaintiff's] report of any psychiatric or psychological symptoms" and that "the brother's collateral report is significant." [*Id.*] 707. Dr. Amdur further found that Plaintiff's "'quirky' manners would eventually become evident to coworkers and supervisors and he would be unable to relate appropriately," and that "[c]ompulsive behaviors would likely cause him to be a slow and inefficient worker." [*Id.*]. Finally, Dr. Amdur found that Plaintiff "would be unable to tolerate stress or deviation from established routines." [*Id.*].

IV.    **The ALJ's Opinion**

On October 30, 2018, the ALJ denied Plaintiff's claim for benefits. [10-3] 14-20. In his written decision, the ALJ relied on the standard, five-step analysis for deciding disability claims.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 2, 2016, his disability onset date. [*Id.*] 16. However, at step two, the ALJ found that Plaintiff did not have an impairment or combination of impairments that had significantly limited (or was expected to significantly limit) the ability to perform basic work-related activities for twelve consecutive months. [*Id.*]. The ALJ reviewed the medical record evidence, the testimonial evidence, and the medical opinions of the state consultants and of Dr. Amdur. [*Id.*] 17-19. The ALJ found that Plaintiff had the medically determinable impairment of status post rectal cancer with surgery and residuals, and further found that Plaintiff's medically determinable impairment "could reasonably be expected to produce the alleged symptoms." [*Id.*] 16, 18. But, the ALJ also found that Plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." [*Id.*] 18.

In support of this finding, the ALJ reviewed the medical evidence related to Plaintiff's cancer diagnosis and renal mass and associated treatments. [*Id.*] 18. The ALJ stated that after Plaintiff was discharged from the hospital in July 2016 with ostomy care instructions, there was no mention in the record of a need for extended

11

nursing home care. [*Id*.]. The ALJ further observed that physical therapy records from September and October 2016 showed that Plaintiff's pain was well controlled, and subsequent records in 2017 showed his energy level was good. [*Id*.]. The ALJ noted that there was no evidence of Plaintiff being treated for depression with medication or otherwise, and that "the evidence reveals that claimant has sufficient mental functioning to drive." [*Id*.].

The ALJ referred to the record evidence that Plaintiff was authorized to receive home care through January 2017, and a report from the assisted living facility indicated that Plaintiff's contract for residency expired on June 30, 2017. [*Id*.]. However, the ALJ went on to state that "[w]hile [Plaintiff] would like me to presume that the evidence establishes that he had a severe impairment for twelve continuous months, there is nothing to indicate that he required any care beyond November 2016." [*Id*.] 19. The ALJ noted that the record was left open after the hearing and Plaintiff's attorney was given time to provide additional evidence and argument that Plaintiff did have a severe impairment lasting twelve months, but that "this was not done." [*Id*.]. The ALJ also noted the testimony that Plaintiff had resided at the assisted living facility until July 2017, but stated that "I am unable to find the [Plaintiff] disabled based on this testimony absent supportive evidence as to the level of care provided, and symptoms and limitations which would preclude the claimant from working." [*Id*.].

The ALJ then turned to the opinion evidence. The ALJ gave "good decisional weight" to the opinions of the state agency medical consultants that Plaintiff did not

have a severe impairment that would last for the requisite twelve months, because they were "consistent with the record as a whole." [*Id.*]. Regarding the opinion of Dr. Amdur, the ALJ noted that the opinion was completed at the request of Plaintiff's attorney, and that Dr. Amdur indicated, based on his examination and the report of Plaintiff's brother, that Plaintiff's "functional capacity was diminished by an obsessive compulsive disorder and autism." [*Id.*]. The ALJ gave the opinion no decisional weight, however, because "the examiner is not a treating source, he relied, in part, on the report of [Plaintiff's] brother, did not provide for any specific functional limitations and does not demonstrate familiarity with Agency criteria for determining disability." [*Id.*]. Finally, regarding the reports of Plaintiff's brother, the ALJ gave the brother's April 2017 letter "little decisional weight" because there were "no records of urgent care after claimant had his September 2016 ostomy reversal," and gave the November 2017 letter "no decisional weight because claimant's brother is not a treating source or other clinical professional and is unfamiliar with Agency policy and procedure for determining disability." [*Id.*].

The ALJ ultimately concluded based on the "totality of the evidence" that Plaintiff did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities, and that, "even if he did, it did not persist for the requisite twelve continuous months." [*Id.*].

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical

13

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted). *See also Berger v. Astrue*,

14

516 F.3d 539, 544 (7th Cir. 2008) ("When an ALJ recommends that the agency deny benefits, it must first 'build an accurate and logical bridge from the evidence to the conclusion.'") (internal citation omitted).

## Discussion

Plaintiff argues that the ALJ's decision should be remanded for further proceedings, because (1) the ALJ committed several errors in how he assigned weight to the medical opinions of the two state agency consultants and his psychiatric consultant Dr. Amdur; (2) the ALJ improperly ignored evidence related to Plaintiff's spinal impairment and failed to consider whether he had a physical impairment or combination of impairments apart from, or in combination with, his cancer-related symptoms; and (3) the ALJ failed to account for Plaintiff's need to use the bathroom frequently and the fact that he required skilled nursing assistance. [13] 1, 6-13.

The Court will address each of Plaintiff's arguments below. Ultimately, on careful review of the parties' briefing, the ALJ's opinion, and the administrative record, the Court finds that substantial evidence supported the ALJ's decision and that the ALJ did not commit any errors warranting remand.

**I.    Substantial evidence supports the ALJ's determination that Plaintiff did not have a severe impairment or combination of impairments lasting for a period of at least twelve months.**

At step two of the disability evaluation process, an ALJ determines whether a claimant's medically determinable impairments, individually or in combination, are "severe." *See generally Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); 20 C.F.R. § 404.1521. A severe impairment is an impairment or combination of impairments

15

that "significantly limit[s] [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). The regulations implementing the Social Security Act state that "basic work activities" include walking, standing, sitting, pushing, and handling; understanding, carrying out, and remembering simple instructions; and responding appropriately to supervision and co-workers. *See* 20 C.F.R. §404.1522(b). In addition to the requirement that they be "severe," the impairment or impairments must have lasted, or be expected to last, for a continuous period of at least twelve months, or they must be expected to result in death. *See* 20 C.F.R. §§ 404.1509; 404.1520(a)(4)(ii). If the ALJ determines that a claimant does not have a severe impairment or combination of impairments, or that the twelve-month duration requirement is not met, the analysis stops at step two and the ALJ finds the claimant is not disabled. *See, e.g., Zims v. Chater,* No. 94 C 3775, 1995 WL 571824, at *5 (N.D. Ill. Sept. 22, 1995); 20 C.F.R. §404.1520(a)(4)(ii) ("If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

Here, after conducting a review of the medical record, opinion, and testimonial evidence related to Plaintiff's claimed impairments, the ALJ found that Plaintiff's medically determinable impairments—his rectal cancer and associated symptoms—did not significantly limit Plaintiff's ability to perform basic activities, and therefore were not severe individually or in combination. [10-3] 19. The ALJ further found that, even if Plaintiff's medically determinable impairments were severe, they did not

persist for the requisite period of at least twelve continuous months. [*Id.*]. Specifically, with an onset date of March 2, 2016, the ALJ found that the record evidence did not extend beyond November 2016. Therefore, the ALJ found Plaintiff was not disabled and stopped his analysis at step two. [*Id.*].

As noted above, Plaintiff raises several complaints with the ALJ's analysis of the medical opinions and record evidence. Before addressing Plaintiff's claims related to the ALJ's handling of the medical opinions, the Court finds it appropriate to start with Plaintiff's arguments that the ALJ improperly ignored evidence related to his other physical impairments, such as has spinal impairment, and failed to account for his need to use the bathroom frequently. These arguments go to the overarching question of whether the ALJ properly addressed the medical record, and lack thereof, and whether the ALJ's determination that Plaintiff failed to satisfy the twelve-month durational requirement was supported by substantial evidence. In answering these questions, the Court finds that, although the ALJ's analysis of the record could have been more thorough, his finding that Plaintiff failed to satisfy the twelve-month duration requirement was supported by substantial evidence. Thus, any error in the ALJ's analysis of the evidence is ultimately harmless.

### A. The ALJ properly reviewed the record and found Plaintiff did not meet the twelve-month durational requirement for disability.

Plaintiff claims as a general matter that the ALJ improperly ignored evidence that establishes that he suffers from medically determinable impairments other than those that were found or identified by the ALJ, and ignored evidence that he suffered from difficulties with ambulation and endurance. [13] 1, 10-11; [29] 6-7. Plaintiff

points in particular to a CT scan from February 2016 showing mild to moderate degenerative changes affecting several levels of his spine, as well as his November 19, 2016 home health care certification which indicated that he had "functional limitations with both endurance and ambulation" approximately two months after his last surgery in September 2016. [13] 10-11 (citing [10-8] 283; [10-23] 1186). Plaintiff also notes that the health care certification states that he should only be up as tolerated, that he was unable to leave his home unassisted, and that he needed assistance with all activities. [*Id.*]. Plaintiff argues that the ALJ ignored the CT scan and November 2016 home health care certification evidence, as well as Plaintiff's reporting of his symptoms to Dr. Amdur and the testimony about his physical limitations. [*Id.*]. Plaintiff thus asserts that the ALJ's finding that he did not have a severe impairment or combination of impairments was flawed, because the ALJ failed to consider all of Plaintiff's medically determinable impairments and whether he had a physical impairment or combination of impairments aside from, or in combination with, his cancer-related symptoms. [*Id.*]; [29] 1.

Similarly, Plaintiff also faults the ALJ for failing to address the evidence related specifically to his need to use the bathroom frequently and his need for nursing services. [13] 12-13. Plaintiff points to a variety of nursing records from his home health care between July 2016 and November 2016 that indicate he complained of issues with frequent bathroom use, in particular frequent diarrhea. [*Id.*] 12 (citing [10-20] 1005; [10-21] 1076; [10-23] 1179, 1181). Plaintiff notes that the records show he was taking a chemotherapy drug whose side effects included diarrhea, prescribed

for "eight more cycles" of two weeks on, one week off, and that he reported having six to eight loose stools a day as of November 2016. [*Id.*]; [10-23] 1179. Plaintiff also argues that the medical records, and his referral for home health care, show that he needed significant home supervision and assistance [*Id.*] 12-13. Plaintiff cites to his home health care certifications and nursing notes in November 2016 demonstrating the care he needed, and further points out that he lived at an assisted living facility until 2017. [*Id.*] (citing [10-23] 1186; [10-6] 167-169). Plaintiff asserts, similar to above, that the ALJ failed to properly account for all of this evidence related to his need for frequent bathroom use and for skilled nursing services, and therefore that the ALJ's decision that he did not suffer from a severe impairment or combination of impairments was not supported by substantial evidence. [*Id.*] 13.

As an initial matter, the Court disagrees with Plaintiff's suggestion that the ALJ ignored Plaintiff's potential spinal impairment. While the ALJ did not specifically mention the CT scan showing degenerative changes to Plaintiff's spine, the ALJ did discuss Plaintiff's allegations of back pain and difficulty with ambulation and endurance. The ALJ noted Plaintiff's testimony about his back pain and that he could not walk more than a block without needing to catch his breath, and also that Plaintiff was prescribed physical therapy in August 2016 for his back pain. [10-3] 17-18. The ALJ went on to observe, however, that records from September and October 2016 from when Plaintiff was in physical therapy, including progress notes after his ileostomy reversal, showed that his pain was well controlled and he was ambulating without difficulty. [*Id.*] 18 (citing [10-21] 1048-1075).

19

Thus, as the Commissioner points out in response, the ALJ did consider the evidence related to Plaintiff's allegations of back pain and endurance. [27] 6. Although the ALJ did not discuss the findings of the CT scan in particular, or the checked boxes on the November 2016 home health care certification form indicating functional limitations in ambulation and endurance, an ALJ "need not mention every piece of evidence." *See, e.g., Poole v. Colvin*, No. 12 C 10159, 2016 WL 1181817, at *7 (N.D. Ill. Mar. 28, 2016) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Further, the mere fact that there is a CT scan indicating degenerative changes in Plaintiff's spine does not, on its own, speak to whether that condition caused any functional limitations. *See Shannon M. v. Saul*, 18 C 7074, 2020 WL 264522, at *5–6 (N.D. Ill. Jan. 17, 2020) ("Diagnosis does not equal disability. . . What matters is the severity of the condition and how it limits plaintiff's capacity to work, based on clinical and/or laboratory findings.") (citing *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)).

However, while the ALJ need not have discussed every piece of evidence, the Court does agree with Plaintiff as a general matter that the ALJ's discussion and analysis of the evidence related to Plaintiff's physical impairments could have been more thorough and explicit. The ALJ did not discuss Plaintiff's November 2016 recertification for home health care in detail, nor did he address the nursing notes from the home health care visits in October and November 2016 after Plaintiff's ileostomy reversal, some of which indicated that Plaintiff continued to experience residual weakness. *See, e.g.,* [10-23] 1122, 1127, 1182, 1186. With respect to Plaintiff's

20

criticism of the ALJ's discussion of Plaintiff's need to use the bathroom frequently, while the ALJ summarized Plaintiff's testimony related to his need to use the bathroom frequently in passing, [10-3] 17, the ALJ did not discuss the issue any further nor cite to the related record evidence, such as the nursing notes from November 2016 indicating that Plaintiff complained to his home health care nurses about frequent diarrhea associated with his chemotherapy medication. [10-23] 1148.

However, Plaintiff's focus on whether the ALJ did or did not address certain evidence or expressly discuss all of Plaintiff's impairments in combination is misplaced, as Plaintiff has failed to address the central basis for the ALJ's decision: that Plaintiff did not produce medical evidence satisfying the twelve-month durational requirement for disability. As discussed above, Plaintiff and his brother testified that Plaintiff resided at an assisted living facility until July 2017, which is consistent with billing records from the facility indicating that Plaintiff had a residency contract until June 30, 2017. *See, e.g.,* [10-6] 167-169. The ALJ noted this testimony and the billing records, and the evidence that Plaintiff was authorized to receive home health care through January 2017. [10-3] 17-18. However, the ALJ also found that there was nothing in the record to indicate that Plaintiff required, or received, any care or treatment beyond November 2016. [*Id.*] 18.

At the hearing, the ALJ explicitly noted this lack of evidence, stating that he did not see any evidence in the record after Plaintiff's ostomy reversal on September 30, 2016, which suggested any significant "work-preclusive limitations." [*Id.*]. 33. The ALJ observed that if Plaintiff were indeed required to be at an assisted living facility

through 2017, there should have been records related to his care while residing there, and that such records substantiating his need for assisted living care and any treatment he received could be "a very strong factor supporting a claim that the individual would not be able to work." [*Id.*] 35. But the ALJ noted that, as of the time of the hearing, the record contained no evidence related to that assisted living care other than a passing reference in Dr. Amdur's report. [*Id.*]. The ALJ thus left the record open after the hearing for the submission of additional evidence. [*Id.*] 53. In doing so, the ALJ expressly noted that any evidence related to Plaintiff's need for sustained assisted living care, or evidence which showed the effects of his chemotherapy extending over a year, could support his arguments for disability. [*Id.*] 53.

But, while Plaintiff did submit additional medical records after the hearing, he did not submit any evidence demonstrating that he required any care or treatment at his assisted living facility past November 2016, well short of March 2017, which would have met the twelve-month requirement based on the March 2, 2016 onset date. [*Id*] 19.[5]

Plaintiff's briefing fails to address this issue. Though Plaintiff cites extensively

---

[5] Plaintiff submitted roughly two hundred pages of additional medical records after the hearing. *See generally* [10-3] 14; (citing [10-18] 907 through [10-23] 1201). These additional records included duplicative progress notes from Plaintiff's cancer center related to his surgeries in July 2016 and September 2016, and his follow up appointments in late 2017 and 2018. [10-18] 907-924; [10-19] 925-984; [10-21] 1048-1075. The additional records did include nursing notes and certifications for Plaintiff's home health care visits while he resided in assisted living. But significantly, those records only covered the time period between July and November 2016. *See, e.g.* [10-20] 985-1047 (nursing notes between July 2016-September 2016); [10-22] 1078-1155 (nursing notes between September 2016-November 2016); [10-23] 1156-1196 (nursing notes between October 2016-November 2016).

to his home health care nursing notes from October and November 2016, which he claims demonstrate his ongoing physical impairments, he notably points to no medical records *after* November 2016. As the ALJ commented at the hearing, one would expect that if Plaintiff were authorized for home health care until January 2017, and was residing in an assisted living facility until July 2017, there would be records of *some* kind documenting his care at the facility during that period. Indeed, it appears that every one of Plaintiff's nursing visits between July and November 2016 generated records from nurses which included their notes or observations from the visit, and any care provided. But not only are there no such nursing notes reflecting any visits after November 2016, there are almost no medical records at all after that point in the record, let alone between December 2016 and July 2017 when Plaintiff was residing at the assisted living facility.

After November 2016 when the nursing notes stop, the record includes a few passing lab reports reflecting metabolic panels in early 2017, but no associated notes of any treatments or examinations by a physician providing any context for the labs. [10-15] 688-702. In any event, Plaintiff makes no mention of these particular records or their significance. The next medical examination note in the record after November 2016 is the May 2017 psychiatrist consultative examination from Dr. Amdur. [*Id.*] 703-707. This examination related specifically to Plaintiff's mental impairments, though Dr. Amdur noted his observation that Plaintiff walked with a normal gait. [*Id.*] 706. The next examination or treatment notes related to Plaintiff's physical impairments are from his follow-up appointments with his cancer center in June and

October 2017, which returned normal findings. [*Id.*] 712-713; 727-28. Specifically, as noted above, the notes indicate that Plaintiff had a good appetite and energy level, no pain, and there was nothing indicating a progression of the disease. [*Id.*]. In short, as the ALJ stated in his opinion, there is no objective medical evidence in the record to indicate that Plaintiff required any care or was experiencing functional limitations after November 2016.

Plaintiff attempts to dismiss the lack of supportive evidence from his later time at the assisted living facility by claiming it is of "de minimis import," because his doctors deemed his residency at such a facility to be required and "the evidence shows the functional impairments he continued to suffer from . . ." [13] 13. But while it is true that Plaintiff was "certified" for home health care until January 2017, the record is limited in terms of any specific medical findings or physician notes associated with the referrals, and notably does not include any evidence that Plaintiff was expected to require care beyond January 2017. For example, the ALJ noted in his opinion that although Plaintiff was referred for ostomy care after his surgeries in July 2016, there was no "mention of a need for extended nursing care" in the referral. [10-3] 18. And while Plaintiff was re-referred for home care after his ostomy reversal in September 2016, there is again a lack of any specific medical findings about the scope of the referral and how long it would be necessary. Rather, the referral form in the record merely states in summary fashion that Plaintiff "needed" the referral. [10-21] 1048. The November 2016 home health care form recertifying Plaintiff for care until January 2017 is likewise lacking in specific or detailed medical findings. Instead, the

24

form consists primarily of a summary of Plaintiff's past diagnoses and symptoms, and includes an outline of rehabilitation goals during the certification period. [10-23] 1186. The fact that Plaintiff was referred for home health care by his physicians in July and November 2016 thus speaks little to whether his impairments continued to cause functional limitations beyond November 2016.

It is true the November 2016 home health care form refers to Plaintiff experiencing some ongoing functional limitations—it includes checked boxes indicating he had limitations in endurance and ambulation, and indicates he should only be up as tolerated and could not leave home unassisted. [10-23] 1186. But even if the ALJ should have accepted these vague and unspecified statements about Plaintiff's limitations in November 2016 at face value, there are, again, no records *past* November 2016 showing that Plaintiff "continued" to experience these functional limitations as he claims. The same is true with respect to Plaintiff's frequent need to use the bathroom. There are no records after November 2016 indicating that the issue persisted and continued to cause any functional impairments. Insofar as Plaintiff suggests that frequent diarrhea was a side effect of his oral chemotherapy medication, which he was to be on for "eight more cycles," he has pointed to no evidence documenting that he in fact completed those cycles or that he continued to experience side effects past November 2016, other than his own testimony.

In sum, to paraphrase the ALJ, while Plaintiff may want the Court to presume that his conditions continued to cause functional limitations for a period of twelve months, there is no objective medical evidence supporting such a finding that his

25

impairments continued to cause any significant functional limitations or required treatment after November 2016. Again, the onset date was March 2, 2016. Even if the ALJ, and by extension this Court, were to assume that Plaintiff's functional impairments documented in November 2016 would continue through the entire home health care certification period until January 2017, that would still not satisfy the requisite twelve-month period.

### B. Plaintiff's subjective statements alone were insufficient to establish disability.

The only support Plaintiff points to showing that he continued to experience functional limitations from his physical impairments after November 2016 is the hearing testimony of Plaintiff and his brother, and Plaintiff's subjective statements to Dr. Amdur at his evaluation in May 2017. [13] 11; [29] 5. But subjective testimony alone is not sufficient to establish a severe impairment. *Green v. Berryhill*, 3:17-CV-00537-MGG, 2018 WL 4659267, at *4 (N.D. Ind. Sept. 28, 2018) ("Plaintiff's testimony alone does not establish disability."); *Curtis v. Colvin*, 12 C 8964, 2014 WL 1917094, at *6 (N.D. Ill. May 13, 2014) ("Yet Plaintiff does not cite a single case indicating that subjective testimony alone suffices to establish a severe impairment. To the contrary, it is undisputed that 'the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.'") (citing *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir.2004) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.") (internal quotation omitted)); *Saldana v. Astrue*, 10 C 1609, 2011 WL 1059694, at *5 (N.D. Ill. Mar. 21, 2011) ("[W]ithout any medical evidence that Plaintiff had an ankle

impairment after August 29, 2001, Plaintiff's testimony is simply insufficient to establish a severe impairment."); *see also* 20 C.F.R. § 404.1529(a) ("We will consider all of your statements about your symptoms. . . However, statements about your pain or other symptoms will not alone establish that you are disabled.").

It is true that the Seventh Circuit has stated that ALJs may not disregard a Plaintiff's testimony about symptoms *solely* because it is not supported by objective medical evidence. *See, e.g., Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009). But that is not what the ALJ did here. The ALJ summarized the testimony of both Plaintiff and his brother, but ultimately found the testimony about the limiting effects of Plaintiff's symptoms was inconsistent with the record. [10-3] 18. As noted above, the ALJ found that the record demonstrated Plaintiff was generally improving after his ostomy reversal in September 2016, there were no records of any treatment or ongoing functional limitations after November 2016, and the few medical records that did exist after November 2016 reflected that Plaintiff was not complaining of pain and had a good appetite and energy level. *See* [*id.*] 17-18. Based on this record, the ALJ was not required to simply accept Plaintiff's testimony about the duration and limiting effects of his symptoms. *See Saldana,* 2011 WL 1059694, at *5 ("Once the ALJ concluded that Plaintiff had failed to prove that her ankle impairment was of sufficient duration, the ALJ was not required to consider Plaintiff's testimony concerning her subjective symptoms 'because that testimony by itself could not support a finding of disability.'") (internal citation omitted); *see also Scheck,* 357 F.3d at 702.

27

Ultimately, it was Plaintiff's burden to present medical evidence in support of his claim that his medically determinable impairments were severe *and* were expected to continue for twelve months. *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021) ("[Plaintiff] bears the burden to prove she is disabled by producing medical evidence."); *Scheck*, 357 F.3d at 702 ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." ); *see also Davis v. Colvin*, 14 CV 8513, 2016 WL 4445261, at *3 (N.D. Ill. Aug. 22, 2016) ("[A]t step two, [plaintiff] has the burden of proving that her conditions are severe, a burden that requires her to produce some evidence suggesting that her conditions significantly limit her work-related functioning *and are expected to last more than twelve months*.") (emphasis added), *aff'd, Davis v. Berryhill*, 723 Fed. Appx. 351 (7th Cir. 2018 ).

Here, the ALJ found the Plaintiff failed to meet that burden. In reviewing that determination, the Court reiterates that it is not its role to reweigh the record evidence and testimony, but rather simply to determine if the ALJ's decision was supported by substantial evidence, and whether the ALJ built the requisite "accurate and logical bridge" between the evidence and his conclusion. *See e.g., Linda T. v. Saul*, No. 19 CV 3950, 2020 WL 5210846, at *4 (N.D. Ill. Sept. 1, 2020) ("[T]he ALJ is required to build an accurate and logical bridge between the evidence and the result. . . But this court is not free to replace the ALJ's estimate of the medical evidence with its own. . .") (internal quotations omitted); *Jennifer F. v. Kijakazi*, 20 C 5365, 2022 WL 3043078, at *10 (N.D. Ill. Aug. 2, 2022) ("[Plaintiff's] interpretation of the

evidence might be reasonable. But that doesn't mean the ALJ's decision is not supported by substantial evidence . . . and an ALJ's decision cannot be overturned merely because reasonable minds might differ as to the import of the evidence.") (internal citations omitted). While the Court agrees that the ALJ's discussion could have been more thorough, the Court finds the ALJ built the necessary "accurate and logical bridge" from the evidence—in particular, the lack of evidence—to his conclusion that Plaintiff did not have a severe impairment or combination of impairments that persisted for the requisite twelve months. In short, the decision was supported by substantial evidence and must stand.

Finally, the Court also finds, insofar as the ALJ committed errors in his analysis of Plaintiff's physical impairments, those errors were harmless. "[T]he harmless error standard applies to judicial review of administrative decisions," and a court "will not remand a case to the ALJ for further specification where [the court is] convinced that the ALJ will reach the same result." *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021) (internal quotation marks omitted). "In assessing whether an error is harmless, [the court] examine[s] the record to determine whether [it] can predict with great confidence what the result of remand will be." *Id.* (internal quotation marks omitted). Here, Plaintiff has pointed to no objective medical evidence showing that he required care or experienced severe functional limitations beyond November 2016. Thus, even if the Court were to remand the case for the ALJ to conduct a more detailed analysis of other physical impairments, such as his alleged spinal impairment and his need to use the bathroom frequently, the Court predicts

with confidence the result would be the same for the simple reason that Plaintiff has not pointed to any objective medical evidence showing those conditions, or any of his other physical impairments, caused any work-related limitations past November 2016. Again, Plaintiff's testimony alone is not enough to establish disability, and in the absences of supporting evidence, the result would be the same even on a remand for further analysis by the ALJ.

## II.  The ALJ did not commit a reversable error in weighing the medical opinion evidence.

Plaintiff devotes most of his briefing to arguing that the ALJ committed a number of legal, factual, and logical errors in how he assessed and assigned weight to the medical opinion evidence. For example, Plaintiff claims the ALJ erred by affording "good decisional weight" to the state agency physicians who did not examine Plaintiff, while affording no weight to Dr. Amdur's opinion, despite the fact he did examine Plaintiff. [13] 7-8. Plaintiff also claims the ALJ erred in affording good weight to the state agency opinions because, contrary to the ALJ's finding, the opinions were not consistent with the record as a whole. [*Id.*] 8. Regarding Dr. Amdur's opinion specifically, Plaintiff argues the ALJ did not follow the SSA regulatory criteria for evaluating medical opinions and erred in affording the opinion no weight, because Dr. Amdur is familiar with SSA criteria for disability and provided adequate explanation and support for his opinion. [*Id.*]. Plaintiff further argues  the ALJ committed an error by failing to explain why Dr. Amdur's partial reliance on Plaintiff's brother's subjective reporting undermined the opinion, and that the ALJ's finding that Dr. Amdur did not provide specific functional limitations was

"misleading." [*Id.*]. Plaintiff also maintains the ALJ improperly substituted his opinion for that of Dr. Amdur in finding no severe mental impairment, because Dr. Amdur was the only mental health professional who provided an opinion on Plaintiff's mental RFC. [*Id.*] 10.

"An ALJ has an obligation to evaluate every medical opinion and explain the weight given to the opinion." *Georgios A. v. Kijakazi*, No. 20-cv-2729, 2022 WL 1004249, at *5 (N.D. Ill. Apr. 4, 2022) (internal quotation marks omitted). Dr. Amdur and the two state agency consultants who reviewed Plaintiff's claim are "non-treating sources," that is, they are medical sources who did not have an ongoing treatment relationship with Plaintiff. *See Simila v. Astrue,* 573 F.3d 503, 514 (7th Cir.2009); 20 § C.F.R. 416.902. When evaluating a non-treating source's opinion, the ALJ is required to determine the weight to assign the opinion by considering certain regulatory factors, including "the claimant's examining and treatment relationship with the source of the opinion; the physician's specialty; the support provided for the medical opinion; its consistency with the record as a whole; and any other factors that tend to support or contradict the opinion." *See Bailey v. Colvin,* No. 3:14-CV-01709-CAN, 2015 WL 4093347, at *4 (N.D. Ind. July 7, 2015); 20 C.F.R. §. 404.1527(c); *see also Simila* 573 F.3d at 514. However, while the ALJ must "consider the factors found in found in 20 C.F.R. §. 404.1527(c)," he need only "minimally articulate" his reasoning, and the ALJ "need not explicitly discuss and weigh each factor." *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (noting that this is a "very deferential standard" which the

Seventh Circuit has described as "lax."); *see also Grotts v. Kijakazi*, 27 F.4th 1273, 1277 (7th Cir. 2022) (an ALJ need only "minimally articulate its reasons for discounting non-treating sources' opinions.").

Here, the Court finds that the ALJ did not commit an error in his analysis of the medical opinions that warrants remand.

## A. State Consultant Opinions

As to Plaintiff's argument that the ALJ committed an error by affording good weight to the state agency consultants who did not examine Plaintiff, while affording no weight to Dr. Amdur who did, Plaintiff is correct that the regulations state that ALJ's will generally "give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." [13] 8 (quoting 20 C.F.R. §404.1527(c)(1)). But, as the Commissioner notes in response, the opinions are not directly comparable, because the state agency consultant opinions related to Plaintiff's alleged physical impairments, *i.e.* his renal mass and cancer related symptoms and Dr. Amdur's opinion related to Plaintiff's alleged mental impairments. [27] 4. That the ALJ afforded differing weights to medical opinions covering discrete issues is of little bearing. What matters is whether, in evaluating each opinion, the ALJ considered the applicable regulatory factors and "minimally articulated" his reasoning. *See, e.g., Collins*, 743 F. App'x at 25.

Regarding the ALJ's handling of the state agency consultant opinions in particular, the Court acknowledges that the ALJ's opinion is considerably lacking in analysis. As noted above, both state consultants opined that Plaintiff did not have an

impairment so severe that would be expected to prevent him from substantial gainful activity for the requisite twelve-month period. [10-4] 64, 72. The ALJ addressed the weight he assigned these opinions in a single sentence, stating that they were given "good decisional weight" because they were "consistent with the record as a whole." [10-3] 19. While consistency with the record is one of the factors the ALJ is supposed to consider, Courts have often been critical of such generalized and boilerplate statements presented without specific additional analysis. *See, e.g., Patrice W. v. Kijakazi,* 20 C 02847, 2022 WL 2463557, at *3 (N.D. Ill. July 6, 2022) (collecting cases).

However, the Court notes that it must read the ALJ's opinion with common sense and "as a whole." *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's decision") (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole")). By the time the ALJ reached the state consultant opinions, he had already analyzed and discussed the medical record and testimonial evidence, and found that record did not demonstrate that Plaintiff required any care for severe impairments past November 2016. *See* [10-3] 17-18; *see also* Section I *supra*. Thus, when the ALJ stated that the state consultants' opinions that Plaintiff's impairments would not persist for twelve months were consistent with the record as a whole, the ALJ was referring, at least implicitly, to his previous explanation and analysis of the record in which he found that there was no evidence of Plaintiff's impairments causing severe functional limitations or requiring any treatment past November

33

2016.

Plaintiff suggests it was an error for the ALJ to find the consultant's opinions consistent with the record, because they did not review the entire record, including Dr. Amdur's evaluation, and their opinions came only two and seventh months after his alleged onset date in March 2016, respectively. [13] 8. But while Plaintiff is correct that the state consultants did not have access to the complete record when they offered their opinions in May and October 2016, the ALJ did. And the ALJ found that the consultants' shared opinion that Plaintiff's conditions would not persist for twelve months was consistent with the ALJ's own review of the record, including the subsequent medical records the state consultants did not review, which did not indicate Plaintiff required any care for his conditions past November 2016. Again, the ALJ could have been more explicit in his analysis, and perhaps should have expressly noted the timing of the consultant opinions and the records to which they had access. However, the Court still finds that, in applying a common sense reading to the opinion as a whole, the ALJ minimally articulated his reasoning for affording the state consultant opinions good decisional weigh. Thus, the ALJ thus did not commit a reversable error. *See Collins*, 743 F. App'x at 25; *see also Spring W. v. Saul,* 20 C 1864, 2021 WL 2529615, at *4 (N.D. Ill. June 21, 2021) ("[I]t is sufficient that the ALJ considered the medical evidence and minimally articulated her analysis in a manner that the Court can follow.").

Furthermore, even if the Court agreed with Plaintiff that the ALJ's analysis of the state consultant opinions was deficient, remand would not be warranted. As noted

34

above, the Court believes any error with respect to the ALJ's analysis of Plaintiff's physical impairments was harmless, because Plaintiff has not cited to any evidence outside his own testimony and that of his brother showing that Plaintiff suffered from a severe impairment for the requisite twelve-month period. Thus, even if the Court were to remand the case for the ALJ to conduct a more detailed analysis of the state consultant opinions, the result would be the same given what this record lacks. *See Butler*, 4 F.4th at 504.

### B. Dr. Amdur's Opinion

With respect to Dr. Amdur, the ALJ provided four express reasons for affording his opinion no weight: (1) Dr. Amdur was not a treating source; (2) he relied, in part, on the subjective reports of Plaintiff's brother; (3) he did not provide for any specific functional limitations; and (4) he did not demonstrate familiarity with SSA criteria for determining disability. [10-3] 19. The Court again acknowledges that the ALJ's reasoning is lacking in detail and explicit analysis. However, the Court nonetheless finds that the ALJ sufficiently articulated his reasoning, and that the ALJ's decision that Plaintiff does not suffer from a severe mental impairment is supported by substantial evidence.

> #### 1. *The ALJ did not err when he discounted Dr. Amdur's opinion, in part, because it was based on Plaintiff's brother's subjective reporting.*

Plaintiff takes particular issue with the second rational offered by the ALJ for discounting Dr. Amdur's opinion—that his report was based, in part, on the subjective reporting of Plaintiff's brother. Plaintiff argues that the Seventh Circuit has rejected ALJ decisions which dismiss examining psychiatrists' opinions because

they were based on subjective complaints. [13] 9 (citing *Aurand v. Colvin*, 654 Fed. App. 831, 837 (7th Cir. 2016) ("it's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms"). The Commissioner responds that the *Aurand* case cited by Plaintiff is distinguishable, and that Dr. Amdur's reliance on the subjective reports of Plaintiff's brother was a valid reason for assigning the opinion no weight. [27] 10 (citing *Rice*, 384 F.3d at 371 (7th Cir. 2004)) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.")

Plaintiff is correct that the Seventh Circuit has found error where an ALJ rejects the opinion of a psychologist or psychiatrist because it was based on the patient's subjective reporting. *See, e.g., Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019); *Aurand,* 654 Fed. App. at 837. In *Mischler,* the court explained that "a psychiatrist does not merely transcribe a patient's subjective statements. Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise." *Id.* (citing *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("psychiatric assessments normally are based primarily on what the patient tells the psychiatrist").

However, this is not to say that an ALJ may never consider the fact that a mental health assessment was largely based on a claimant's subjective reporting. A mental-health provider can be too uncritical or accepting of a patient's subjective

complaints, or may not adequately assess those complaints through the "objective lens" of his or her professional expertise. *See generally Hager v. Kijakazi*, 20-CV-788-JDP, 2021 WL 3088060, at *5 (W.D. Wis. July 22, 2021) ("[T]he court doesn't read *Mischler* and *Price* as prohibiting an ALJ from discounting a mental health opinion because it relies primarily on the claimant's subjective complaints. Rather, the key question is whether the report of the psychologist or psychiatrist indicates that he or she used 'professional expertise' to assess the claimant's credibility."). In such cases many courts, including the Seventh Circuit, have affirmed the decision of an ALJ to discount the opinion of a mental-health provider. *See, e.g. Winsted*, 923 F.3d at 478 (holding that "the ALJ adequately articulated his reasons for discounting" a state psychologist opinion, because the report was "based on only one evaluation and largely reflected [the claimant's] subjective reporting"); *Alvarado v. Colvin*, 836 F.3d 744, 748 (7th Cir. 2016) (holding it was not an error for the ALJ to give less than controlling weight to a treating psychologist's opinion, in part because it was based on subjective reporting from the claimant and his mother); *Michael K. v. Saul*, 20 C 2696, 2020 WL 7337821, at *8 (N.D. Ill. Dec. 14, 2020) (finding that the ALJ properly rejected an "uncritical" opinion from a psychiatrist that the plaintiff was disabled, where the opinion was contradicted by normal objective findings); *Hager*, 2021 WL 3088060, at *5 (finding the ALJ did not err by considering a psychologist's reliance on the plaintiff's subjective reporting in weighing the opinion, because the psychologist did not connect his objective observations or the results of any tests to

his findings).[6]

Here, the Court finds that the ALJ did not err in discounting Dr. Amdur's opinion because it was based, in part, on the subjective reporting of Plaintiff's brother. First, the situation is distinguishable from the *Mischler* and *Price* line of cases because it involves an opinion not based on self-reports, but based, almost entirely, on the collateral reports of a third-party. Plaintiff denied any obsessive-compulsive symptoms, and largely reported no mental health concerns other than depression associated with his cancer. [10-15] 704. But Plaintiff's brother asserted that Plaintiff was "OCD" and "very quirky" with behavioral oddities, and asked Dr. Amdur if his brother may be autistic, and the report makes clear that Dr. Amdur based his ultimate opinions almost entirely on these collateral statements from Plaintiff's brother. [*Id.*] 706 ("An accurate appreciate of [Plaintiff's] condition is not possible without the brother's collateral information."). *Mischler* and *Price* are thus not directly applicable.

Second, contrary to *Mischler*, Dr. Amdur's opinion does not indicate that he assessed Plaintiff's complaints, or his brother's subjective reporting, through the "objective lens of [his] professional expertise." Dr. Amdur did not review or rely on

---

[6] The Court acknowledges that there is some level of ambiguity in the caselaw on this issue. The *Winsted* and *Alvarado* opinions were issued after *Price* but before *Mischler,* and the Seventh Circuit has not directly addressed how to reconcile these two lines of cases and explain whether and when an ALJ may properly discount a mental health opinion based on subjective reporting. As it is, the Court agrees with the reasoning of courts in cases such as *Hager* and *Michael K.,* in that it does not take *Mischler* and *Price* to mean an ALJ may *never* discount a mental health opinion because it relies primarily on subjective reporting. *Hager*, 2021 WL 3088060, at *5. Rather, the caselaw stands for the proposition that an ALJ may properly discount an opinion on that basis where the provider is too uncritical, and fails to show they assessed subjective complaints through the "objective lens of their professional expertise."

any medical records, and his objective assessments and evaluation of Plaintiff returned normal findings. [*Id.*] 703, 706-707. For example, in addition to Plaintiff's largely normal self-reports and denial of any obsessive-compulsive symptoms, Dr. Amdur found Plaintiff's hygiene and grooming were satisfactory, he was calm, focused and corporative, he was coherent, and he understood the questions put to him. [*Id.*] 706. Dr. Amdur also administered a cognitive assessment and found that any impairment was "slight." [*Id.*] 707. And yet, following a single examination during which Dr. Amdur returned normal findings, Dr. Amdur accepted Plaintiff's brother's subjective reporting at face value, absent any further corroboration, and diagnosed Plaintiff with OCD and Autism Spectrum Disorder. [*Id.*].

Comparing the circumstances here with those in *Robert F. v. Kijakazi,* a recent case from the Northern District of Indiana, is instructive. There, the ALJ rejected a neuropsychological opinion that the plaintiff could not work because it was purportedly based on the subjective reporting of the plaintiff's siblings. *Robert F. v. Kijakazi*, 2:21CV299, 2022 WL 2527322, at *3–4 (N.D. Ind. July 7, 2022). The court noted that agency regulations require objective support for medical opinions, and that the ALJ was generally permitted to reject an opinion based on subjective complaints that lack any objective support. *Id.* However, the court noted that the examiner had conducted a "battery of neuropsychological tests" on the plaintiff, and did not "rely solely" on Plaintiff's siblings' reports to reach her conclusions about the plaintiff's inability to function. *Id.* at *4. The test results were thus "objective evidence" supporting the opinion, and the ALJ had failed to consider the results of the tests on

which the provider based her opinion. *Id.* The court thus ordered remand for the ALJ to conduct a proper evaluation of the opinion. *Id.*

Unlike the provider in *Robert. F.,* here Dr. Amdur did not point to any objective tests or evaluation in support of his opinion, but simply relied on the brother's subjective reporting. In his reply brief, Plaintiff asserts that Dr. Amdur did include his own objective observations, in that he observed Plaintiff's "pervasive denial and minimization," which is why he needed Plaintiff's brother's report to appreciate his condition. [29] 1-2 (citing [10-15] 706). But Dr. Amdur's report is vague as to the basis of this finding regarding denial and minimization, which appears as a single sentence in the "Mental Status Examination" section, and which notably comes *after* the section of the report detailing the brother's collateral report. In other words, it appears Dr. Amdur only found that Plaintiff denied and minimized his symptoms after his brother provided a contrary subjective report of his "OCD" and "quirky" behavior. While the Court supposes Dr. Amdur could have used his "objective" expertise is deciding to credit the brother's reports over Plaintiff's, this does not change the fact that his ultimate findings were essentially a verbatim adoption of the brother's subjective reports, and there is simply no indication that Dr. Amdur tied his opinion to any objective mental evaluation of Plaintiff or objective test results. *Compare* with *Robert F.*, 2022 WL 2527322, at *3–4. The opinion here thus stands in contrast to the kind of mental health assessment discussed by *Mischler,* because Dr. Amdur's is in essence a "transcription" of subjective reporting. *See, e.g., Derry v. Berryhill*, 1:18-CV-00090-SLC, 2019 WL 1856960, at *5–6 (N.D. Ind. Apr. 24, 2019)

(ALJ properly rejected a mental-health provider opinion because it "*does* appear to merely transcribe [plaintiff's] subjective symptoms, making it an exception to the norm.") (internal quotations omitted).

Ultimately, the Court finds that the ALJ did not err when he discounted Dr. Amdur's opinion, in part, because it was based on Plaintiff's brother's subjective reporting. *See, e.g., Winsted*, 923 F.3d at 478 (ALJ properly rejected a mental health opinion which was "based on only one evaluation and largely reflected [the claimant's] subjective reporting.").

### 2. *The ALJ's other rationales for discounting the opinion are valid.*

Plaintiff's other complaints regarding the ALJ's reasons for discounting Dr. Amdur's opinion are also unavailing. As the Commissioner notes in response, Plaintiff's opening brief did not address the first aspect of the ALJ's rationale, that Dr. Amdur is not a treating source. [27] 9. In his reply brief, Plaintiff asserts in passing  the fact that Dr. Amdur was not a "treating doctor" is not a sufficient reason to reject his opinion, "especially given his experience working with SSA [sic]." [29] 4. But of course, the extent of Dr. Amdur's treating and examining relationship with Plaintiff is one of the express factors the ALJ was permitted to consider in assigning weight to the opinion. *See Bailey*, 2015 WL 4093347, at *4; 20 C.F.R. §. 404.1527(c). Not only was Dr. Amdur not a treating source, but he only examined Plaintiff on one occasion, which was done, as the ALJ noted, at the request of Plaintiff's attorneys. [10-3] 19. Further, the ALJ did not reject Dr. Amdur's opinion *only* because he was not a treating source, but provided other bases for assigning his opinion no weight.

41

Regarding the ALJ's finding that Dr. Amdur did not provide specific functional limitations, Plaintiff tacitly concedes that is the case. [13] 9 ("it is true that Dr. Amdur did not provide specific, quantified functional limitations. . ."). But Plaintiff argues that Dr. Amdur nonetheless did provide opinions related to Plaintiff's functional limitations arising from his mental impairments and the ALJ was wrong to ignore his findings, and that it was the ALJ's responsibility to "translate" those opinions into work-related limitations in a mental RFC. [13] 9. The Court agrees that the ALJ could have addressed Dr. Amdur's opinions related to Plaintiff's limitations with more specificity. But the ALJ is permitted to weigh an opinion based not only on the express factors in the regulations, but "any other factors that tend to support or contradict the opinion." *Bailey,* 2015 WL 4093347, at \*4; 20 C.F.R. §. 404.1527(c). The Court agrees, and Plaintiff has essentially conceded, that Dr. Amdur's opinion on Plaintiff's functional mental limitations is vague at best, and the ALJ was permitted to consider the lack of specificity in assigning weight to the opinion.

As to Dr. Amdur's familiarity with agency criteria, Plaintiff argues this finding was erroneous because Dr. Amdur has experience working as a consulting psychiatrist on SSA cases, and regardless, the ALJ did not explain why he needed to be familiar with SSA standards. [13] 10. As the Commissioner points out however, the ALJ did not assert that Dr. Amdur was or was not familiar or experienced with SSA criteria, but that he did not *demonstrate* such familiarity in his assessment. [27] 10-11. Further, the ALJ need not have explained why familiarity with agency criteria was relevant, because it is one of the express factors listed in the regulations that an

42

ALJ may consider. *See, e.g., Vang v. Berryhill,* 18-C-277, 2019 WL 13090104, at \*15 (E.D. Wis. Mar. 5, 2019) ("the regulations provide that 'understanding of our disability programs and their evidentiary requirements' is a relevant factor, and there was nothing wrong with the ALJ mentioning it. . .") (citing 20 C.F.R. § 404.1527(c)(6)).

Again the Court must emphasize that its role is not to reweigh the evidence, or re-evaluate Dr. Amdur's opinion and determine if this Court would have weighed it differently than the ALJ. Rather, the Court must simply determine if the ALJ "minimally articulated" his reasoning in light of the applicable regulatory factors, and if his decision was supported by substantial evidence. The Court finds that the ALJ satisfied this requirement and sufficiently articulated his four reasons for discounting the opinion such that the Court can trace the logic of his reasoning. The decision must therefore stand. *See William M. v. Saul,* 1:19-CV-32, 2019 WL 7047310, at \*7 (N.D. Ind. Dec. 23, 2019) ("[T]he ALJ's explanation for affording [the] opinion no weight was adequate to allow the court to trace his path of reasoning. The court may not reweigh the evidence. The ALJ has supported his decision with substantial evidence, and therefore remand is not appropriate.")

To the extent the ALJ should have been more detailed in his analysis of the opinion, the Court does not believe that warrants remand. Given the vague and conclusory nature of the opinion, and the fact that it strikes the Court as merely a verbatim adoption of Plaintiff's brother's subjective reporting, any failure by the ALJ to assess the opinion more in line with the regulatory factors was harmless. *See Hane*

*v. Berryhill,* 17 C 6292, 2018 WL 2299226, at *2 (N.D. Ill. May 21, 2018) ("Because assessing this opinion in accordance with the regulatory factors would not have made it more substantial or relevant, the ALJ's failure to do so is not a basis for remand.").

   3.  *The ALJ did not "play doctor."*

Finally, the Court rejects Plaintiff's argument that the ALJ, in dismissing Dr. Amdur's opinion, inappropriately "played doctor." It is true that Dr. Amdur provided the only mental health evaluation in the record, but the ALJ was not required to accept it simply because it was the only one. *See, e.g., Vian v. Commr. of Soc. Sec.,* 1:15-CV-00040-SLC, 2017 WL 461561, at *9 (N.D. Ind. Feb. 2, 2017) ("[T]he ALJ is not required to adopt an opinion of a medical professional solely on the basis that it is the only opinion of record."); *Gildon v. Astrue,* 260 F. App'x 927, 929 (7th Cir. 2008) ("An ALJ is not required to accept a doctor's opinion if it "is brief, conclusory, and inadequately supported by clinical findings."). Further, the Court notes that, as the Commissioner points out in response, the reason Dr. Amdur's opinion is the only one in the record related to Plaintiff's mental health is because Plaintiff did not allege or claim any mental impairments at the initial application or reconsideration levels. [27] 11-12. In other words, Plaintiff did not put his mental health at issue until the ALJ hearing process, which is why no state agency consultant opined on any mental impairments. The lack of another mental health assessment in the record is thus based on how Plaintiff pursued his claim. Further, that Dr. Amdur provided the only mental health evaluation, standing alone, does nothing to bolster the weight or import of Dr. Amdur's opinion in the way that Plaintiff suggests. Quite the contrary,

the lack of any other evidence demonstrating mental health treatment or examinations in the record undercuts Dr. Amdur's findings.

Regardless, the ALJ did not "play doctor" in assessing and evaluating the medical opinion and assigning it weight. *Patricia B. v. Berryhill*, No. 17 CV 50201, 2019 WL 354888, at *2 (N.D. Ill. Jan. 29, 2019) ("An ALJ plays doctor by ignoring relevant medical evidence and using his judgment to make his own medical findings; in contrast, he does *not* play doctor when he discusses and weighs the medical evidence and makes appropriate inferences from that evidence"). Plaintiff suggests that the ALJ made a medical finding by determining Plaintiff did not have a severe mental impairment. Quite to the contrary, what the ALJ did was simply review and evaluate the mental health opinion by Dr. Amdur and assign it weight. Further, though the ALJ was not explicit in his analysis, the ALJ did mention the other evidence and, more to the point, the lack of other record evidence related to Plaintiff's mental health and functioning. Specifically, the ALJ noted that there was no evidence that Plaintiff was treated for depression with medication or otherwise, and noted that the evidence revealed that Plaintiff had "sufficient mental functioning to drive." [10-3] 18. The ALJ was permitted to evaluate this evidence against Dr. Amdur's lone opinion, which the ALJ determined to be of no decisional weight, and make a determination about Plaintiff's mental impairments. *Armstrong v. Barnhart*, 287 F. Supp. 2d 881, 886-87 (N.D. Ill. 2003) ("the ALJ was not 'playing doctor,' but performing his duty to consider and weigh the evidence."); *Olsen v. Colvin*, 551 Fed. Appx. 868, 874 (7th Cir. 2014) ("The cases in which we have concluded that an ALJ

'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment.").

In sum, the Court finds that the ALJ did not commit a reversible error in his evaluation of the medical opinion evidence, and that his decision was supported by substantial evidence.

## Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment [12] is denied, the Commissioner's motion for summary judgment [26] is granted, and the Commissioner's decision denying Plaintiff's application for benefits is affirmed.

*Heather K. McShain*

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 9, 2022**